By the, Court—Bosworth, Ch. J.
Where goods are fraudulently purchased with a preconceived design not to pay for them, the purchaser does not acquire a title to them. The defrauded vendor may recover possession of them from the fraudulent purchaser, or from any one claiming under him not being a Iona fide purchaser for value.
It is not indispensable that any representation should have been made; it is enough that the goods were obtained with the fraudulent intent not to pay for them, and under circumstances that deceived, and which it was designed should deceive the vendor, and induce him to part with the possession of the goods.
In Tanner v. Bennett, (1 Ry. & Moody, 182 ;) Root v. French, (13 Wend., 570 ;) and Brown v. Montgomery, (20 N. Y. R., 287,) it does not appear that any representation was made.
The important question in the present case is whether the evidence given by the plaintiffs should have been submitted to the Jury, and was sufficient to uphold a verdict finding that the purchase was fraudulent.
In Root v. French, (supra,) the case states that the plaintiff sold the goods on the 14th of Hovember, 1832, to one Jenkins, and that he, on the 17th, assigned them, with all his stock in trade, to the defendant, to indemnify him for responsibilities assumed for Jenkins, as -indorser. “The plaintiff proved the purchase by Jenkins fraudulent, being made on the eve of bankruptcy.” Ho other evidence of fraudulent intent is stated in the case.
In Brown v. Montgomery, (supra,) the fraud consisted in selling a check made by a firm reputed to be in good standing, after being informed that a check drawn by the same parties had been that day protested for non-payment, without disclosing that information. The Court held that the transaction was a fraud which avoided the sale.
*608 In that case, Denio, J., said, that in Nichols v. Pinner, (18 N. Y. R., 295,) “we decided, that where a merchant, knowing himself to be insolvent, purchases goods without disclosing the fact, there being no inquiry made, he is not necessarily guilty of fraud, as he may honestly believe that he can go on and retrieve his embarrassments. * *
But the case does not countenance the position, that a dealer who has been of known standing, but who has suddenly failed in business, can go to those who were acquainted with his former character, but who have not heard of his failure, and innocently purchase their property on credit. Judge Seldek, in his opinion, puts that case as one not covered by the judgment.” (Id., 305.)
The observation of Judge Seldek here referred to, is that “ there may be circumstances under which the concealment of a marked and sudden change in the pecuniary affairs of a purchaser, which he had reason to suppose unknown to the vendor, might amount to a fraud;” but the case of Nichols v. Pinner did not appear to him to be such a case. (18 N. Y. R., 305.)
These' propositions and the cases cited concur in supporting the doctrine, that where the omission to disclose the fact of insolvency or great pecuniary embarrassment on applying to purchase from one supposing and believed to suppose the applicant solvent, is the result of a fraudulent purpose to get possession of goods with intent not to pay for them, the purchase will be fraudulent; while it will not be, if the omission is in consequence of an honest belief that the purchaser can improve his condition, and will be able to pay for the goods.
And for this reason, the mere fact of an omission to disclose his insolvency, there being no questions asked or representations made, will not of itself be prima facie evidence that the purchase was made with a fraudulent intent.-
Do the circumstances attending the purchases in question, or of either of them, furnish such evidence of a purchase with a fraudulent intent, as should have been submitted to the Jury ?
*609 It was proved that Sheldon had dealt with the plaintiffs since 1856. Prior to the transactions in question he had bought on his personal credit. On the 8th of July, 1859, he owed the plaintiffs some $2,700 or $3,000.
It is a natural inference that the plaintiffs had been selling to him on credit, relying on his solvency, and that he had been purchasing from time to time, believing that the plaintiffs sold and parted with their property in this confidence.
On the 8th of July, 1859, George King told Sheldon, on Ms then applying to buy more goods, that he thought Sheldon owed him enough on his individual paper; that King wanted other paper, such as he would approve. He testifies thus: “ He (Sheldon) named various paper which I declined to take; he then named other paper which I agreed to take. Sheldon offered and King agreed to take the paper of Baldwin & Dodd of St. Louis, and Ruis & Reeke of Louisville.”
Requiring business paper for the goods then applied for, does not necessarily indicate that King had any doubt of Sheldon’s solvency, or any suspicion of any adverse change in the condition of his business. It is all consistent with the idea that the credit was as large as was given, according to the ordinary course of business, or as had at any previous time been given.
King also'testifies that the sale of the 26 th of July was made on the terms of Sheldon’s paying with the paper of John McHeil & Go., whenever King chose to demand payment. When he applied to make that purchase he proposed to pay with such paper, and that offer was' accepted, and the goods delivered.
On the 16th of August, 1859, the twenty-first day after the last purchase, Sheldon assigned all Ms property to the defendants, by an assignment which stated his inability to pay Ms creditors “ with punctuality, or in full.” There are schedules annexed to the assignment, which, as the assignment states, are intended to contain a statement of *610 all Ms property and of all debts owing to Mm, with a list of Ms creditors.
These schedules show an indebtedness to the amount of about $120,000, and that all the debts owing to Sheldon amounted to only about $60,000, and that all of such debts, whether evidenced by notes, or resting in open account, had been pledged to some of his creditors, before the assignment was made.
They also show that he had but little merchandise which had not also been pledged.
They also show that he had an account against Ruis & Reeke, amounting to $283, and an account against John McNeil, amounting to $1,310.26, both of which had been pledged, but does not show that he had a note against either of them, or any note or account against Baldwin & Dodd.
King testifies that about two weeks after the assignment, he was present at a meeting of Sheldon’s creditors •, that he thinks Sheldon and E. W. Phillips were present. That a statement was submitted; some of the creditors examined it, and thought the estate could pay from twenty to thirty cents on the dollar, and were willing to take that, if the Messrs. Phillips would becoine security for the amount.
PTo witness was examined, nor was any evidence given, to rebut or affect any inference which a Jury might justly draw from the facts before stated.
These facts furnish some evidence that Sheldon was irretrievably insolvent when he made these purchases, and that he knew it. That he applied to the plaintiffs, expecting to obtain goods on their reliance upon his solvency, good faith and ability to pay as he had agreed, and that they parted with their property in this confidence.
In the absence of any explanation from Sheldon, a Jury might find that he had pledged the account against McPfeil prior to the 26th of July. Also that he had received no orders from Baldwin & Dodd or from Ruis & Reeke, nor'had any reason to suppose that he would; and *611 that he had no grounds whatever for expecting to become possessed of their paper.
Under such circumstances, and in the absence of any explanations from Mr. Sheldon, a Jury might find that he did not intend to pay for the goods; and that he gave assurances of his ability to furnish, and promised to furnish paper made by the firms named, to mislead and deceive the plaintiffs, and induce them to part with goods which they declined to deliver on his personal responsibility alone. A verdict to this effect, found on such evidence, would not be disturbed.
Assuming the testimony of Mr. King to be true, as we ' must on this appeal, it being neither contradicted nor discredited, what Sheldon said amounts to a representation that he could furnish the paper he had agreed to give, and within the time he had contracted to furnish it.
If he makes no explanation to counteract the force of the evidence given by the plaintiffs, a Jury might find that the representation was known to be untrue when made, and was made in bad faith and with intent to defraud.
We think the evidence should have been submitted to the Jury.
It is, of course, open to the defendants to rebut the evidence given by the plaintiffs, and to prove a state of facts tending to show or establishing that these assurances were given and promises made in-good faith; and that according to the usual course of his business, or by reason of orders received, or other arrangements made, he might reasonably expect to be able to furnish the paper he had promised.
But on the case presented by the record before us, there is no explanation or attempt at explanation.
We also think that a Jury might properly find that this suit was commenced before the affidavit was made in Hew Jersey to obtain an attachment in that State.
On that fact being found or established, the commencement of the attachment suit would be no bar to the present, either as a matter of estoppel’ or of evidence.
*612 The judgment must be reversed and a new trial granted, with costs to abide the event.